# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION

**CHINEY JONES,**

     **Plaintiff,**

**vs.**                     **Case No.  1:19cv123-CAS**

**ANDREW SAUL,**
**Commissioner of Social**
**Security,**

     **Defendant.**
_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned U.S.
Magistrate Judge upon consent of the parties and reference by U.S. District
Chief Judge Mark Walker.  ECF No. 17.  *See* Fed. R. Civ. P. 73; 28 U.S.C.
§ 636(c).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for
review of the final determination of the Commissioner (Commissioner) of
the Social Security Administration (SSA) denying Plaintiff's application for a
period of disability and Disability Insurance Benefits (DIB).  After careful
consideration of the entire record, the decision of the Commissioner is
affirmed.

## I. Procedural History

On March 15, 2016, Plaintiff, Chiney Jones, filed an application for DIB benefits alleging disability beginning March 14, 2016, based on lupus, fibromyalgia, arthritis, asthma, hypertension, chronic tissue disorder, and muscle spasms.  Tr. 15, 21, 56-50, 157-63, 184.[1]  Plaintiff's date last insured for DIB was September 30, 2021.[2]  Tr. 15, 17, 164.

Plaintiff's application was denied initially on May 23, 2016, and upon reconsideration on August 5, 2016.  Tr. 15.  On August 23, 2016, Plaintiff requested a hearing.  Tr. 15, 96-97.  On June 27, 2018, Administrative Law Judge (ALJ) William H. Greer, held a video hearing in Jacksonville, Florida, with Plaintiff and counsel appearing in Gainesville, Florida.  Tr. 15, 30-54.  Plaintiff was represented by Martin T. Goldberg, an attorney.  *Id.*  Plaintiff testified.  Tr. 33-48.  Charles K. Heartsill, an impartial vocational expert, also testified.  Tr. 15, 48-53, 255-59 (Resume).

On July 12, 2018, the ALJ issued a decision denying Plaintiff's application for benefits.  Tr. 15-25.  On September 17, 2018, Plaintiff filed a request for review and a memorandum.  Tr. 152-56.

---

[1]  Citations to the record transcript/administrative record, ECF No. 14, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  Plaintiff was age 45 on her alleged onset date of March 14, 2016, and completed four years of college.  Tr. 21, 56.

On May 4, 2019, the Appeals Council noted that it had considered Plaintiff's request for review and determined that "the reasons do not provide a basis for changing the [ALJ's] decision." Tr. 1. The Appeals Council's order makes the ALJ's decision the final decision of the Commissioner. Tr. 1-7; *see* 20 C.F.R. § 404.981.

On July 1, 2019, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision. ECF No. 1. The parties filed memoranda of law, ECF Nos. 25 and 26, and Plaintiff filed a reply, ECF no. 29, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant meets the insured status requirements of the Social Security Act through September 30, 2021." Tr. 17.

2. "The claimant has not engaged in substantial gainful activity since March 14, 2016, the alleged onset date." *Id.*

3. "The claimant has the following severe impairments: obesity; rheumatoid arthritis, lupus, asthma, fibromyalgia and arthralgia." *Id.* The ALJ determined that Plaintiff has several non-severe physical impairments including hypertension and carpal tunnel syndrome. Tr. 18. The ALJ also determined that Plaintiff's "medically determinable mental impairment of anxiety order does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." *Id.* The ALJ considered the broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments. The four areas are known as the "paragraph B" criteria. *Id.* The ALJ determined Plaintiff had *no*

limitation regarding understanding, remembering, or applying information and with interacting with others. Tr. 18. The ALJ also determined that Plaintiff had a *mild* limitation regarding concentrating, persisting, or maintaining pace and in adapting or managing oneself. Tr. 19. Thus, the ALJ determined that Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas," and, as a result, "is non-severe." *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 20. In making this finding, the ALJ considered the listings found in sections 14.00 (Immune System Disorders) and 12.00 (Mental Disorders) in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ noted that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." Tr. 20. The ALJ considered Plaintiff's obesity in conjunction with other impairments and considering SSR 02-1p, noting her use of a cane to assist in walking, and determined that this factor did not meet requirements of a listing. *Id.*

5. "[T]he claimant has the residual functional capacity [RFC] to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a).[3] The claimant can have no concentrated or

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A Specific Vocational Preparation (SVP) of 4 means "[o]ver 3 months up to and including 6 months" and an SVP of 5 means "[o]ver 6 months up to and including 1 year." Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* Semi-skilled work corresponds to an SVP of 3-4 and skilled work corresponds to an SVP of 5-9 in the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000). Although social security rulings do not carry the "force and effect of the law or

excessive exposure to pulmonary irritants, such as dust, fumes, extremes in temperature or humidity."  Tr. 20.

6. "The claimant is capable of performing past relevant work as a <u>Clerk Typist</u>.  This work does not require the performance of work-related activities precluded by the claimant's [RFC]."  The vocational expert testified that Plaintiff's past relevant work included Clerk Typist, DOT # 203.362-010, sedentary exertion, and SVP of 4, and Supervisor Telephone Clerk, DOT # 239.132-010, light exertion and SVP of 5.  Tr. 25.  The ALJ noted that Plaintiff's past work was performed within the last 15 years and lasted long enough for Plaintiff to learn it, and was performed at SGA levels.  *Id.*  In addition, the ALJ noted that the vocational expert testified that Plaintiff's use of a cane as an additional limitation or limitations of fine handling or fingering would not prevent her from performing her past relevant work as a clerk typist.  *Id.*  The vocational expert also testified that off task behavior of over 20% would not be tolerated and after exhaustion of accrued time, employer tolerance allowed no more than two absences per month, but that employee who needed to elevate their legs to chair height would not be able to maintain employment.  Finally, the vocational expert testified that his testimony regarding use of a cane, off task behavior, absenteeism, and elevation of lower extremities was based on his knowledge of these jobs and how they are performed, and employer's workplace demands and how they have changed over time.  *Id.*

7. "The claimant has not been under a disability, as defined in the Social Security Act, from March 14, 2016, through the date of this decision."  Tr. 25.

## III.  Legal Standards

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

---

regulations," *see* <u>Heckler v. Edwards</u>, 465 U.S. 870, 873 n.3 (1984), "[t]hey are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).

legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[4]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other

---

[4]  If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

observers, including family members], and (4) the claimant's age, education, and work history.' " Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he or she is under a disability prior to the expiration of her insured status. See 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[5]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the

---

[5] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor").

assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.  The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007) (unpublished).

As the finder of fact, the ALJ is charged with the duty to evaluate all the medical opinions of the record, resolving conflicts that might appear.

20 C.F.R. § 404.1527.[6]  When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion:

(1) the frequency of examination and the length, nature, extent of the

treatment relationship; (2) the evidence in support of the opinion, such as

"[t]he more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight"

that opinion is given; (3) the opinion's consistency with the record as a

whole; (4) whether the opinion is from a specialist and, if it is, it will be

accorded greater weight; and (5) other relevant but unspecified factors.

20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to

the contrary.  <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

This is so because treating physicians "are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative

---

[6]  This provision applies to claims, such as Plaintiff's claims, filed before March 27, 2017.  For claims filed after that date, section 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This

requires a relationship of both duration and frequency."  Doyal v. Barnhart,

331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating

physician must be supported by substantial evidence, Marbury v. Sullivan,

957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.

Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is

given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at

1053.

The ALJ may discount the treating physician's opinion if good cause

exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).

Good cause may be found when the opinion is "not bolstered by the

evidence," the evidence "supported a contrary finding," the opinion is

"conclusory or inconsistent with [the treating physician's] own medical

records," the statement "contains no [supporting] clinical data or

information," the opinion "is unsubstantiated by any clinical or laboratory

findings," or the opinion "is not accompanied by objective medical evidence

or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937

F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578,

582 (11th Cir. 1987)). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Opinions on some issues, such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of the case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d); *see* Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986). "[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996).[7] Although physician's opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative because the ALJ has responsibility of assessing the claimant's RFC. *See supra* at n.5.

---

[7] SSR 96-5p was rescinded effective March 27, 2017, but applies here considering Plaintiff's DIB filing date of March 15, 2016.

A treating physician's opinions that a claimant is unable to work and is necessarily disabled would not be entitled to any special weight or deference, however.  The regulations expressly exclude such a disability opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability.  20 C.F.R. § 404.1527(d)(1), (3).  In <u>Lewis v Callahan</u>, the court noted that "we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition.  Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings."  125 F.3d at 1440.

Notwithstanding, generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(2), (5); *see* <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions were entitled to greater weight than those of other physicians)

(<u>Benecke</u> quoted in <u>Somogy v. Comm'r of Soc. Sec</u>., 366 F. App'x 56, 65 n.13 (11th Cir. 2010) (unpublished)).  Although a claimant may provide a statement containing a treating physician's opinion of her remaining capabilities, the ALJ must evaluate such a statement in light of the other evidence presented and the ALJ must make the ultimate determination of disability.  20 C.F.R. §§ 404.1512, 404.1513, 404.1527, 404.1545.

## IV.  Medical and Other Evidence

### A.

The ALJ determined that Plaintiff has severe impairments of obesity, rheumatoid arthritis, lupus, asthma, fibromyalgia and arthralgia.  Tr. 17. The ALJ determined Plaintiff had several non-severe physical impairments of hypertension and carpal tunnel syndrome and briefly referred to medical records pertaining to these impairments.  Tr. 18.  The ALJ also determined that Plaintiff's anxiety disorder did not cause her more than a minimal limitation in her ability to perform basic mental work activities and therefore was non-severe.  In making this finding, the ALJ considered the broad areas of mental functioning known as the "paragraph B" criteria.  The ALJ considered medical and other records in reaching conclusions regarding this issue.  Tr. 18-19; *see supra* at 3-4.

As part of his RFC determination, the ALJ considered Plaintiff's

reports of daily activities:

> The claimant is 47 years of age and was 45 years of age as of the alleged onset date. She completed 4 years of college. The claimant contends that her ability to work is limited due to lupus, fibromyalgia, arthritis, asthma, hypertension, chronic tissue disorder and muscle spasms. She reported she last worked as a Program Assistant in March 2016 and stopped working due to her conditions (Ex. 1E). The claimant reported that pain interfered with sleeping; she had restless nights because of pain. She said that she was not able to watch movies, bake cakes/pies, play volleyball and ride/drive in a car for at least an hour because of her health condition. The claimant reported she could walk about two minutes before needing to stop and rest. The claimant reported that she was unable to sit for long periods; she could not kneel or climb stairs. She reported be[ing] unable to concentrate at times; she estimated she could pay attention about thirty minutes. She reported she could not finish what she started (Ex. 5E-Function Report).

Tr. 21.

The ALJ also considered numerous medical records in determining

the scope and extent of Plaintiff's RFC. Tr. 21-24. Plaintiff alleged her

onset date of disability began on March 14, 2016.[8] Tr. 21. The ALJ's

discussion of medical evidence begins with the record documenting a

January 2016 rheumatology office visit. *Id.* However, earlier medical

---

[8] The ALJ did not expressly mention medical evidence pre-dating Plaintiff's alleged onset date. Tr. 15-25.

records provide a foundation for analysis of the medical evidence

considered by the ALJ and are discussed here for that reason.

## B.

Prior to the alleged onset date, upon a referral from Dr. George

Benchimol, Plaintiff was examined by Michael Rozboril, M.D., on

September 6, 2013, due to abnormal serology with a positive anti-nuclear

anti-body (ANA) titer, joint pain, muscle pain, and swelling with inactivity,

which was reported to  not be remedied by Cymbalta or Lortab.  Tr. 342.

Plaintiff reported she had "missed work due to pain; goes in late, can't work

full day."  *Id.*  On examination, she had tenderness of the neck and trap

muscles.  Tr. 343.  Her shoulders, hip, and wrist had good range of motion;

no synovitis of the elbows, shoulders, wrists, knees, ankles, and fingers;

tender lateral epicondyles; tender anserine and trochanteric bursae, and

tender premalleolar fat pads.  Tr. 344.  Her extremities revealed no edema,

cyanosis, or clubbing; varicose vein changes - with superficial varicosities;

pulses intact at ankles and no digital pitting scars or ulcers.  From a

neurological standpoint, she was grossly intact to DTR, PP, and strength.

*Id.*  Dr. Rozboril diagnosed "Fibromyalgia - explains most all of her

symptoms" and found she had no signs or symptoms of anti-immune

diseases despite the positive ANA; however, further testing was ordered. *Id*.

## C.

Since August 2013, Plaintiff received general medical treatment at Gainesville Family Physicians (GFP) from George Benchimol, M.D. Tr. 272-302, 359-61.[9]  On August 7, 2013, at her first patient visit, a review of systems was normal, including that she had no muscle weakness and myalgia.  Tr. 299.  Her physical exam conducted on August 9, 2013, by Dr. Benchimol, indicated a normal mental status and peripheral vascular items.  The assessment and plan included (for her displacement, lumbar without myelopathy) that she would continue to get short-acting opiates from her pain specialist but was encouraged to minimize the use of narcotics for control of chronic pain and to review other options with her pain specialist.  Tr. 300.  Current plans for fibromyalgia and for "anxiety state NOS" were provided.  *Id*.

---

[9]  On August 7, 2013, Plaintiff established healthcare with Gainesville Family Physicians (GFP).  Tr. 299-300; 346-49.  She described her medical problems, in part, as chronic pain in joints, frequent headache, leg pain with walking, numbness or tingling, palpitations, shortness of breath, and added asthma, arthritis, herniated discs. Tr. 351.  She briefly described problems: "I have consistent pain in my joints - knees & legs are worse but entire body frequently aches.  I have several asthma attacks weekly - mostly when I'm stressed out.  I also have neck & back spasms on a weekly basis and I have been having headaches for the past few weeks."  *Id*.

Chest X-rays of August 14, 2013 showed no acute cardiopulmonary abnormality.  Tr. 282.

On August 21, 2013, Dr. Benchimol examined Plaintiff and a review of systems was normal.  Tr. 297.  The physical examination resulted in normal findings regarding her mental status, general appearance, orientation, build and nutrition, posture, gait, hydration and voice.  *Id*. Chest and lung exam were normal.  *Id*.  In October 2013, Dr. Benchimol examined Plaintiff with similar results.  Her blood pressure has been controlled, and uric acid decreased.  Tr. 296.  Notes stated: "She saw Dr. Rozboril who agreed with the diagnosis of fibromyalgia but was not clear about the diagnosis of lupus.  She got a second opinion with Dr. Lloyd who felt she likely did have lupus and started her on [P]laquenil.  Except for a few headaches she has tolerated the Plaquenil well."  *Id*.  She was started on Plaquenil 200 mg with no refill.  *Id*.  Dr. Benchimol noted that "[s]he has had improvement in her fibromyalgia symptoms since starting Cymbalta.  Continue current treatment."  *Id*.

On December 31, 2013, Dr. Benchimol examined Plaintiff and the physical exam was generally normal, although joint pain and stiffness were noted.  Tr. 293-94.  Regarding musculoskeletal, Dr. Benchimol stated: "Physical exam demonstrates a little swelling around the ankle.  There is no

obvious abnormality noted interior forefoot area. There is no erythema or open source. Range of motion appears normal." Tr. 294. Regarding Enthesopathy, Ankle NOS, Dr. Benchimol noted that the "[p]hysical exam is most consistent with generalized osteoarthritis." On the same day, Dr. Benchimol completed an application (one-page check-off form) for a permanent disabled person parking permit for Plaintiff, citing a "[s]evere limitation to [Plaintiff's] ability to walk due to an arthritic, neurological, or orthopedic condition."[10] Tr. 339.

On February 19, 2014, Plaintiff was examined for complaints of a cough. Tr. 291. Her mental status, posture, and gait were normal. Tr. 291-92. Her symptoms were "consistent with bronchitis with exacerbation of her underlying asthma." *Id.* An antibiotic was prescribed and she was continued on three medication regimens. *Id.*

On March 31, 2014, Plaintiff appeared with a complaint of Lymphadenopathy. Tr. 289. She had been previously diagnosed with an

---

[10]  By way of digression, on December 4, 2014, Plaintiff had a GYN return visit with Southeastern Integrated Medical (SIMED) Women's Health. Tr. 468. Several active problems were reported: arthralgia - knee, patella, tibia, fibula; carpal tunnel syndrome; disorders of connective tissue diffuse; hypertension; long term use of other medications; myalgia and myositis, and obesity. *Id.* Medications, including Cymbalta, were noted. *Id.* Her chief complaint was for Depo-Provera, a contraceptive injection. *Id.* Prior diagnoses of hypertension, fibromyalgia, and lupus per Dr. Benchimol were mentioned. *Id.* A review of systems was negative, and she was to return in three months for her next injection. Tr. 469. Plaintiff had previous visits at this facility on September 10, 2013, (annual exam) with generally normal exam results, Tr. 474-79; June 10, 2014, and September 8, 2014. Tr. 469-73.

upper respiratory infection associated with Lymphadenopathy. *Id*.; *see* Tr. 292. Her mental status was normal. Tr. 290. It is noted that Plaintiff had "not been doing well in terms of, myalgias, and joint discomfort. These conditions were felt to be secondary to a combination of autoimmune disorder and fibromyalgia. She was tried on Plaquenil but could not tolerate the side effects of the medication [and] was discontinued. Currently she is only on NSAID therapy as well as Cymbalta. As a result, her discomfort has broken through a few times and she has had lots of missed work." *Id.* (Dr. Lloyd's name is mentioned immediately above the "impression. *Id.*)

Also, on March 31, 2014, Dr. Benchimol completed a Family Medical Leave Act form (check-off form with some written notes) for Plaintiff's employer noting that she would be incapacitated or need to work part-time for her "lifetime as [lupus] flares up." Tr. 318, 320. He explained that the episodic flare-ups would make it "difficult to type with joint pain," during which time she would be absent from work or unable to perform her job function. *Id.* He opined the frequency and duration of flare-ups would vary and were unpredictable, and that the condition was lifelong. *Id.*

On April 21, 2014, Plaintiff presented with hypertension and for a follow-up on blood pressure which was slightly improved. Tr. 287. A

review of symptoms was generally normal, including the notation that

muscle weakness and myalgia were not present.  Tr. 287.  Her physical

exam results were normal, including notes that she was alert, cooperative,

not in acute distress or sickly, oriented x4, and had normal posture and

gait.  Tr. 287-88.

On June 11, 2014, Plaintiff followed up with Dr. Benchimol for

hypertension.  Tr. 285.  A review of symptoms was generally normal as

was the physical exam.  Tr. 285-86.  Dr. Benchimol noted he was pleased

with Plaintiff's blood pressure control.  Tr. 286.

On July 6, 2015, Plaintiff had a six-month follow-up exam with

Dr. Benchimol and "[s]ince her last visit she has been feeling well.  Her

respiratory and coronary status has been stable.  She has not had any

chest pains or shortness of breath.  She is trying to remain active.  She has

been compliant with medications."  Tr. 278.  A review of systems was

normal as was the physical examination, including the right and left upper

extremities, which had normal strength and tone.  Her posture and gait

were normal and muscle weakness and myalgia were not present.  Tr. 279-

80. The mental status exam was also normal with several favorable

findings.  Tr. 280.  She remained stable in terms of her lupus and was

monitored by her rheumatologist.  Regarding fibromyalgia, "[s]he has been

doing well on Cymbalta for management of her fibromyalgia" and her current therapy would continue. *Id.* She was to continue to monitor her blood pressure; asthma symptoms have been well-controlled with intermittent use of a short acting beta agonist. *Id.*

On August 28, 2015, Plaintiff complained of hip pain for approximately one month with right hip pain increasing with weight-bearing, walking, and climbing stairs; she denied a fall. She was taking NSAID. Tr. 276. She was referred to "Institute Orthopedic." Tr. 277.

On January 6, 2016, Plaintiff appeared for a six-month follow-up and was examined by Dr. Benchimol. Tr. 272-75. Her medical condition and issues were status quo and Dr. Benchimol noted she appeared to be "doing well." Tr. 272-73. Muscle weakness and myalgia were not present. Tr. 273. Plaintiff continued to work with her pain specialist and her lupus was being managed by her rheumatologist (Mark Lloyd, M.D.) and appeared to be doing well. Tr. 272, 274. The review of systems and examination were generally normal. Tr. 273-74. While a patient of Dr. Benchimol, Plaintiff was referred to and was examined by Dr. Lloyd, M.D., at Southeastern Integrated Medical (SIMED) Arthritis Center on January 27, 2016, Tr. 353, 417 (duplicate), having previously received treatment from Dr. Lloyd.

On November 10, 2017, subsequent to the alleged onset date,

Dr. Benchimol noted that Plaintiff "has been working with her

rheumatologist concerning her diagnosis of fibromyalgia and lupus.  She is

on Cymbalta which appears to be helping but she is still fairly limited in her

physical activity abilities.  She is trying to remain active."  Tr. 484.

Medications were refilled.  Tr. 487-88.

**D.**

From January 9, 2014, (her first office visit), through June 2014,

Plaintiff received treatment from Mark Lloyd, M.D., at the SIMED Arthritis

Center due to increasing joint and muscle pain and fatigue which were

"adversely affecting her daily life."  Tr. 304-16, 325-33.  During this time,

Plaintiff was noted to have 18/18 trigger points with moderate diffuse

tenderness and was diagnosed with fibromyalgia and a diffuse connective

tissue disorder.  Tr. 307 (June 12, 2014), 312 (May 29, 2014).  Her Mobic

dosage was increased to twice daily for arthralgia flares.  *Id.*

On January 27, 2016, Plaintiff returned to Dr. Lloyd for a follow-up

after an 18-month absence, reporting that she continued to take Mobic,

Flexeril, and Cymbalta.  She had discontinued Plaquenil due to headache

and dizziness; and she still had diffuse aches, pain, fatigue, and decreased

sleep.  Tr. 353, 384, 417.  Upon examination, 18/18 trigger points were

noted with moderate diffuse tenderness.  Tr. 356.  The ANA titer was high, the complete blood count was abnormal, the sedimentation rate was high, and the SM/RNP (mixed connective tissue disease) antibody was positive. Tr. 357-58, 574-77.

Dr. Lloyd's assessment was obesity, diffuse connective tissue disorder, arthralgia of the knee/patella/tibia/fibula, carpal tunnel syndrome, and myalgia and myositis.  Tr. 357-58.  He explained that the "physical exam is consistent with FMS [fibromyalgia]" and left knee bursitis/osteoarthritis pain and, based on the laboratory testing positive ANA/SM/RNP an increased ESR (sedimentation rate), she "likely has MCTD [mixed connective tissue disease] as well."  Tr. 358.  Due to the past adverse reaction to Plaquenil, Cymbalta was increased to 60 mg twice daily, and future consideration for retrying Plaquenil or Imuran.  *Id*.  Flexeril 10 mg was continued and Mobic 7.5 mg twice-daily was prescribed for knee pain.  Hydrocodone-Acetaminophen was prescribed for fibromyalgia pain as needed.  *Id*.

On March 8, 2016, Plaintiff reported diffuse aching pain and fatigue. Tr. 379.  Review of systems noted no back pain or muscle aches and no localize joint pain.  Tr. 380.  Examination noted 18/18 positive trigger points

with moderate diffuse tenderness.  Tr. 382.  The diagnosis remained the same and medications were continued.  Tr. 382-83.

On April 21, May 19, June 16, August 10 (first page missing, Tr. 439-40), September 8, November 1, December 6, 2016, Plaintiff reported to Dr. Lloyd ongoing symptoms of muscle and joint pains with fatigue, but that she was doing better with the increased dosage of Cymbalta and Mobic. Tr. 364, 369, 374, 444, 449, 454.  Examination again indicated 18/18 positive trigger points with moderate tenderness.  Tr. 367, 372, 377, 442, 447, 452, 457.  The diagnosis remained the same and medications were continued.  Tr. 367-68, 372-73, 377-78, 442-43, 446-47, 452-53, 457-58.

The treatment notes and examination remained the same on January 3 and February 2, 2017 (last page missing), with ongoing muscle and joint pain, fatigue, 18/18 positive trigger points with moderate diffuse tenderness, and unchanged diagnoses.  Tr. 459, 462-64.  Mobic, Hydrocodone-Acetaminophen, Cymbalta, and Flexeril were continued. Tr. 463.

### E.

Dr. John D. Colon is a physician with the Alachua County Health Department (ACHD).  Plaintiff obtained general medical care from ACHD from March 4, 2015, through April 5, 2018, mainly through their Health

Maintenance System and visits with nurses at either the family planning clinic or nursing protocol unit. Tr. 492-577, 586-91. She also met infrequently with Dr. Colon during this timeframe and as noted below. Among other patient records from medical sources, the ALJ considered several of Dr. Colon's patient notes during this timeframe. Tr. 22-23.

It appears Plaintiff's care with the ACHD began on or about March 5, 2015, when it was noted that she lost her insurance. Tr. 565-67. Her chief complaint was "undesired fertility" and a limited exam assessment was done. She received a Depo-Provera contraceptive injection, as she did during future exams. Tr. 565. No serious medical problems are noted. *Id*. Blood pressure, height, weight and BMI, *e.g.*, BMI 46.3 and weight of 287.2, are noted as they are during future visits. The same exam regimen (nursing protocol visits) and treatment are noted throughout 2015 until April 2016. Tr. 555-64.

As of June 28, 2016, it is noted that Plaintiff had not had an annual exam since 2014. Tr. 553. She desired to continue with "Depo at this time." Tr. 553. Her blood pressure was elevated. Notes indicate that Plaintiff has "Lupus and fibromyalgia" and was in pain in the morning. *Id*. She had forgotten to take her blood pressure medication before leaving for her appointment and was counseled on the importance of medication

compliance. *Id.* Plaintiff recently obtained "Alachua Cares for her insurance." *Id.*

On July 7, 2016, Plaintiff complained of swelling of the left lower knee radiating pain of 8/10 in severity with ankle swelling. She was advised to continue using Mobic for ongoing arthritic pain and to seek treatment at the emergency room. She was "severely obese" with a BMI 48.51. Tr. 549-50; *see* Tr. 22. On September 13, 2016, was told to return in three months for a complete physical exam. Tr. 548. Plaintiff appeared for another nursing protocol visit on December 7, 2016, to receive her routine contraceptive injection and was told to schedule an annual physical "as soon as possible." Tr. 545-46. Plaintiff had similar visits on February 22, 2017, and May 15, 2017. Tr. 541-44.

On June 9, 2017, Plaintiff returned to the ACHD for a "focused visit." Tr. 536. Her pain scale was "2." *Id.* It appears the purpose of the visit was for medication refills and a right leg wound. *Id.* Notes indicate:

> 46 yo female with PMHx significant for fibromyalgia, Lupus, and connective tissue disorder, and hypertension. She reports she takes tramadol, Cymbalta, and Mobic and chlorthalidone. She was previously seeing Rheumatologist Dr. Mark Lloyd at Simed and Dr. Benchimol for primary care. She lost her insurance and is seeking to establish care at health department. Also reports a right leg wound in which she hit her ankle on a bed railing 2 months ago. Says she still has a tender, red wound that is not healing.

Tr. 536.  A review of systems was generally normal except she admitted

having a muscle/joint problem; pain and stiffness for four years; and sores

that are hard to heal regarding a right ankle wound.  *Id*.  The physical exam

indicated that Plaintiff was in no apparent distress.  Tr. 537.  Her mental

status, mood and affect, were "[a]ppropriate to situation."  *Id*.  There were

comments related to the right leg wound on her lateral malleolus that was

tender and warm to touch.  *Id*.  The assessment and plan note stated:

asthma without status asthmaticus (disorder).  *Id*.  She was examined by a

PA.  *Id*.

On June 27, 2017, it was noted, in part, that Plaintiff's joints

revealed no abnormalities or swelling; she had full range of motion (X4)

in all extremities; and her muscle strength was 5/5 in all extremities.

Tr. 534.  Plan comments included low fat diet, aerobic exercise, and

avoidance of concentrated sugars.  *Id*.

On October 26, 2017, Plaintiff returned to the family planning

clinic for another focused visit and contraceptive injection.  Tr. 527, 529.

Medications included Cymbalta and Mobic.  Tr. 528.

In December 2017, clinical notes from ACHD noted that Plaintiff

was treated, in part, by Dr. Colon, Tr. 524, and reported "0" on the pain

scale.  Tr. 520; *see* Tr. 22.  Medications were noted.  Tr. 521.

The record noted complaints of coughing, shortness of breath, chest congestion, and stuffy nose. Tr. 520. On review of systems, Plaintiff denied any complaints. Physical examination findings were noted as benign/unremarkable. The assessment included fibromyalgia treated with refill of Cymbalta, asthma with status asthmaticus (disorder) treated with ProAir medication refill, and upper respiratory infection treated with Amoxicillin. Tr. 520-26.

Also in January 2018, Plaintiff presented to the emergency department at North Florida Regional Medical Center for mild non-productive cough. Tr. 580. She also complained of bilateral knee pain typical of fibromyalgia and lupus flare up. On physical examination, the record noted supple neck, with full and painless range of motion. Tr. 582. Plaintiff's back was noted as having full and painless range of motion, and no thoracic or lumbar tenderness. *Id.* Neurologically, she was noted as alert and oriented times three. Her gross sensory and motor function were intact. *Id.* The record noted fibromyalgia, established hypertension, and upper respiratory infection. Tr. 584.[11]

---

[11] Plaintiff was treated, in part, by Robert Mazalewski, M.D. Tr. 580.

January 5, 2018, adult health clinic progress notes reflect a focused visit.[12]  The record noted a reported pain scale of "0".  Tr. 514. On review of systems, claimant denied fatigue/tired or sluggishness. The claimant also denied muscle/joint problems, muscle pain or swelling.  Similarly, the claimant denied neck pain, stiffness, dizziness, headache, movement problem, numbness or tingling.  Physical examination findings reflect claimant appeared in no acute distress, with no musculoskeletal joint abnormalities or swelling, full range of motion times four of all extremities and 5/5 muscle strength in all extremities.  Tr. 514-18.

On January 11, 2018, Plaintiff appeared at the ACHD for a nursing call clinic supply visit and received another contraceptive injection. Medications were noted.  Tr. 509-11.  Pain scale was reported as "5." Past medical history reflected "Chronic pain (arthritis fiber myalgia [sic] LUPUS, High blood pressure."  Tr. 509.  Her BMI was 49.3.  The patient notes were created by an RN and cosigned by Dr. Colon.

An April 5, 2018, clinical visit summary, noted a reported pain scale of "0" and no acute complaints.  The review of systems noted

---

[12]  Plaintiff was treated, in part, by Dr. Colon.  Tr. 518.

normal as to general details, denied fatigue, being tired, sluggishness, fever, or weight change. Physical examination findings reflect claimant appeared in no apparent distress. Tr. 587-90. The records were created, in part, by Dr. Colon. Tr. 588.

On May 18, 2018, Dr. Colon completed a Physical Residual Functional Capacity Questionnaire (PRFCQ). Tr. 592-96. There are several handwritten notes in the form, but the form also consists of check-off responses. *Id.* In the form, Dr. Colon noted that Plaintiff's impairments have lasted or were expected to last at least twelve months. He stated that emotional factors contributed to claimant's symptoms and functional limitations, but noted that the record did not identify or select from a list of psychological conditions that affected Plaintiff's physical condition. The word "no" was written in the space for other psychological conditions. Dr. Colon opined that Plaintiff's impairments were not reasonably consistent with the symptoms and functional limitations described in the evaluation, but checked the box indicating that Plaintiff's experience of pain or other symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple tasks. Tr. 593. He checked the box indicating that Plaintiff was incapable of even "low stress" jobs and

noted that claimant was not working.  He opined that Plaintiff was not able to walk a city block without rest or severe pain; that she could sit for one hour at a time before needing to get up; and could stand for ten minutes at a time before needing to sit down or walk around.  *Id.*  He checked the box indicating that Plaintiff could sit, stand/walk less than two hours total in an 8-hour workday with normal  breaks, and that she must use a cane or other assistive device while engaging in occasional standing/walking.  Tr. 594.  He cited limitations in lifting and carrying; turning her head; stooping, and climbing.  Tr. 595-95*.*  He opined that Plaintiff would have significant limitation with reaching, handling or fingering, and that her impairments would likely produce "good days" and "bad days."  Tr. 595.

## V.  Legal Analysis

### Substantial evidence supports the decision rendered by the ALJ and he correctly applied the law.

Plaintiff claims the ALJ's evaluation of the medical evidence is flawed partly because the ALJ did not properly evaluate the medical opinion of John Colon, M.D., one of Plaintiff's treating physicians.  Plaintiff also argues that ALJ's failure to discuss and weigh the March 2014 opinion of Dr. Benchimol, a prior treating physician, failure to mention the opinion of Dr. Schiff, a State Agency reviewer, and failure to properly consider

Plaintiff's fibromyalgia constitute legal error resulting in the ALJ's RFC

determination as being unsupported by substantial evidence.  ECF No. 25

at 11- 18.  Finally, Plaintiff contends that the ALJ's assessment of her

mental impairment is unsupported by substantial evidence.

### A.

We begin with consideration of Dr. Colon's patient notes followed by

consideration of his May 18, 2018, Physical Residual Functional Capacity

Questionnaire (PRFCQ).  Tr. 592-96.  Plaintiff obtained general medical

care from the Alachua County Health Department (ACHD) and Dr. Colon

from March 4, 2015, through April 5, 2018, mainly through their Health

Maintenance System and visits with nurses at either the family planning

clinic or nursing protocol unit.  Tr. 492-577, 586-91.  Among other patient

records from medical sources, the ALJ considered several of Dr. Colon's

patient notes during this timeframe.  Tr. 22-23.

On June 28, 2016, ACHD notes indicate that Plaintiff had not had an

annual exam since 2014.  Tr. 553.  The ALJ stated that July 7, 2016, ACHD

notes indicate Plaintiff was advised to continue using Mobic for her

complaint of ongoing arthritic pain.  Tr. 22 (citing records at Tr. 549-50).

Plaintiff was described as "severely obese" with a BMI 48.51.  Tr. 549-50.

On September 13, 2016, Plaintiff was told to return in three months for a

complete physical exam.  Tr. 548.  Plaintiff appeared for another nursing protocol visit on December 7, 2016, to receive her contraceptive injection and was told to schedule an annual physical "as soon as possible." Tr. 545-46.  Plaintiff had similar visits on February 22, 2017, and May 15, 2017.  Tr. 541-44.

The ALJ noted that Plaintiff returned on June 27, 2017, to the ACHD for a "focused visit."  Tr. 22 (citing records at Tr. 533-34).  Her pain scale was "2."  *Id.*  Notes indicate she reports taking tramadol, Cymbalta, and Mobic and chlorthalidone.  The ALJ noted that Plaintiff's reported her symptoms had improved since increasing her medication, and examination findings disclosed no joint abnormalities or swelling; Plaintiff had a full range of motion in all extremities, and 5/5 muscle strength.  *Id.*  A physical exam on June 9, 2017, indicated that Plaintiff was in no apparent distress. Tr. 537.  Her mental status, mood and affect, were "[a]ppropriate to situation."  *Id.*

The ALJ noted that in November 2017, Dr. Benchimol indicated that Plaintiff was status quo in terms of her medical issues and was still taking Cymbalta, which was helping, but was still fairly limited in her physical activities, without specifying those activities.  Tr. 22 (citing records at 484-

88).  Plaintiff's history notes for that visit reported that she was employed full time at the University of Florida.  *Id.*

As discussed by the ALJ, clinical notes from ACHD in December 2017 indicated that Plaintiff was treated, in part, by Dr. Colon, Tr. 524, and reported "0" on the pain scale.  Tr. 520; *see* Tr. 22.  The ALJ noted that the claimant denied any complaints, and physical examination findings were noted as benign/unremarkable.  The assessment included fibromyalgia, treated with refill of Cymbalta, asthma with status asthmaticus (disorder), treated with ProAir medication refill, and upper respiratory infection, treated with Amoxicillin.  Tr. 22-23 (citing records at Tr. 520-26).

The ALJ also considered the records from Plaintiff's January 2018 visit to the emergency department [at North Florida Regional Medical Center] for mild non-productive cough and bilateral knee pain typical of fibromyalgia and lupus flare up.  Tr. 23.  The record noted a supple neck, with full and painless range of motion and claimant's back as having full and painless range of motion, with no thoracic or lumbar tenderness.  *Id.*  The record noted fibromyalgia and established hypertension, upper respiratory infection.  *Id.* (citing records at Tr. 580-85).

The January 5, 2018, progress notes, from the health clinic (treating provider Dr. Colon) were discussed in which Plaintiff reported pain scale of "0". Tr. 23 (citing records at Tr. 515-18). The ALJ noted that on review of systems, claimant denied fatigue, tiredness or sluggishness. The Plaintiff also denied muscle/joint problems, muscle pain or swelling. Similarly, the Plaintiff denied neck pain, stiffness, dizziness, headache, movement problem, numbness or tingling. Physical examination findings reflect Plaintiff appeared in no acute distress, with no musculoskeletal joint abnormalities or swelling, full range of motion of all extremities and 5/5 muscle strength in all extremities. *Id.* (citing records at Tr. 514-18).

The ALJ also noted that an April 5, 2018, clinical visit summary showed a reported pain scale of "0" and no acute complaints. The review of systems noted normal as to general details, denied fatigue, tiredness, and sluggishness, and denied fever or weight change. Physical examination findings reflect claimant appeared in no apparent distress. Tr. 23 (citing records at Tr. 587-90). The records were created, in part, by Dr. Colon. Tr. 588.

The ALJ discussed Dr. Colon's May 18, 2018, Physical Residual Functional Capacity Questionnaire (PRFCQ), Tr. 592-96, which Plaintiff

contends was not properly considered.  ECF No. 25 at 13.  The

questionnaire includes handwritten notes and check-off remarks, which

courts have found are "not particularly informative" and "weak evidence at

best."  *See* Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) ("Given

that the 'check-off form' did not cite any clinical test results or findings and

[the doctor's] previous treatment notes did not report any significant

limitations due to back pain, the ALJ found that the MSS was entitled to

'little evidentiary weight.'"); Dixon v. Astrue, No. 5:09-cv-320/RS/EMT, 2010

WL 4942141, at *14 (N.D. Fla. Oct. 26, 2010) (explaining that ALJ properly

rejected conclusory opinions expressed by treating physician on "check-off"

type forms where treating physician's own treatment notes did not support

opinions expressed on those forms), *report and recommendation adopted*,

No. 5:09cv320 RS-EMT, 2010 WL 4929045 (N.D. Fla. Nov. 30, 2010);

Jones v. Comm'r of Soc. Sec., 478 F. App'x 610, 612 (11th Cir. 2012)

(unpublished) (holding that the boxes checked by the doctors did not

constitute their actual RFC assessment because checking boxes did not

indicate the degree and extent of the claimant's limitations); *see also* Foster

v. Astrue, 410 F. App'x 831, 833 (5th Cir. 2011) (unpublished) (physicians

"questionnaire" format typifies "brief or conclusory" testimony).

Simply put, Dr. Colon's PRFCQ did not provide an acceptable

explanation for his opinions or refer to objective medical evidence to

support his opinions. *See* <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d

1155, 1159-60 (11th Cir. 2004). The ALJ described Dr. Colon's

evaluation as follows:

> The undersigned considered a May 2018 Physical Residual
> Functional Capacity Questionnaire completed by John D. Colon,
> M.D., Alachua County Health Department, who reported that
> claimant's diagnosed rheumatic joint disease had a poor
> prognosis. The record identified clinical findings to include ankle,
> knee swelling. The record noted treatment that may have
> implications for working was anti-inflammatories. The claimant's
> impairments have lasted or were expected to last at least twelve
> months. The record noted emotional factors contributed to
> claimant's symptoms and functional limitations. The record did
> not identify or select from a list of psychological conditions that
> affected claimant's physical condition; and "no" was written in the
> space for other psychological conditions. The record noted that
> claimant's impairments were not reasonably consistent with the
> symptoms and functional limitations described in the evaluation.
> However, the record noted that the claimant's experience of pain
> or other symptoms were constantly severe enough to interfere
> with attention and concentration needed to perform even simple
> tasks. The record noted that claimant was incapable of even "low
> stress" jobs and explained that claimant was not working. The
> record noted claimant was not able to walk a city block without
> rest or severe pain. The claimant could sit for one hour at one
> time before needing to get up, stand for ten minutes at one time
> before needing to sit down, walk around. The claimant could sit,
> stand/walk less than two hours total in an 8-hour workday, with
> normal breaks. The record noted claimant must use a cane or
> other assistive device while engaging in occasional
> standing/walking. The claimant could never lift/carry 10 pounds or
> less, could rarely look down, turn her head left or right, look up or
> hold her head in a static position. The claimant could occasionally

twist, rarely stoop or crouch and never climb ladders or stairs.
The claimant would have significant limitation with reaching,
handling or fingering. The claimant's impairments would likely
produce "good days" and "bad days" (Ex.11F) [Tr. 592-96].

Tr. 24.

The ALJ concluded, regarding Dr. Colon's medical source statement:

The undersigned gives little weight to the assessment of
Dr. John Colon in the medical source statement. The reported
limitations are simply not supported by the treatment records of
Dr. Colon as claimant's primary care doctor at the Alachua
County Health Department. Likewise, the record does not
document that a cane was prescribed for walking in the
treatment records or in claimant's Function Report.

*Id.*

The ALJ fully considered Dr. Colon's PRFCQ, and his medical

records concerning Plaintiff's care, and concluded that the reported

limitations in the PRFCQ form are not supported by the treatment records

of Dr. Colon as claimant's primary care doctor at the ACHD. Tr. 24.

Substantial evidence of Plaintiff's medical visits in which no pain was

reported and in which Plaintiff demonstrated full range of motion supports

the ALJ's determination that the medical records do not support Dr. Colon's

assessment of the severity of Plaintiff's medical condition.[13] But this does

---

[13] The ALJ also noted that the record does not document a prescription for the
cane that Dr. Colon indicated was used by Plaintiff. Tr. 24. Plaintiff contends that the
ALJ improperly relied on this fact. ECF Nos. 25 at 12; 29 at 2. A review of the decision
discloses that the determination of no disability was not based on lack of a prescription
for a cane; moreover, whether a cane was prescribed or needed for ambulation, does

not end the inquiry concerning whether Plaintiff's medical records and other evidence support her claim of disability.  Other longitudinal medical evidence should, therefore, be considered.

## B.

Prior to the alleged onset date of March 14, 2016, Plaintiff was examined by Michael Rozboril, M.D., on September 6, 2013, due to abnormal serology with a positive anti-nuclear anti-body (ANA) titer, joint pain, muscle pain, and swelling with inactivity, which was not remedied by Cymbalta or Lortab.  Tr. 342.  Dr. Rozboril diagnosed "Fibromyalgia - explains most all of her symptoms" and found she had no signs or symptoms of anti-immune diseases despite the positive ANA; however, further testing was ordered.  *Id.*

Since August 2013, Plaintiff received general medical treatment at from George Benchimol, M.D.  Tr. 272-302, 359-61.  At her August 7, 2013, patient visit, a review of systems was normal, including that she had no

---

not impugn the correctness of the RFC in this case.  *See, e.g.*, Baker v. Comm'r of Soc. Sec., 384 F. App'x 893, 895 (11th Cir. 2010) (unpublished) ("The parties dispute whether the ALJ determined if Baker's cane was 'medically necessary,' but this issue is not dispositive.  Even an individual using a medically required hand-held assistive device can perform sedentary work, depending on the facts and circumstances of the case.").  In the present case, just as in Baker, "[a]though some of the reporting physicians noted that [claimant] requires a cane to walk, no physician of record rendered an opinion that suggests that the cane limits [the] ability to comply with the exertional requirements of sedentary work."  *Id.* at 895-96.

muscle weakness and myalgia.  Tr. 299.  The assessment and plan

included that she would continue to get short acting opiates from her pain

specialist but was encouraged to minimize the use of narcotics for control

of chronic pain and to review other options with her pain specialist.  Tr. 300.

Current plans for fibromyalgia and for "anxiety state NOS" were provided.[14]

*Id.*

On August 21, 2013, a review of systems was normal.  Tr. 297.  The

physical examination resulted in normal findings regarding her mental

status, general appearance, orientation, build and nutrition, posture, gait,

hydration and voice.  *Id.*  Chest and lung exam were normal.  *Id.*  On

October 23, 2013, Dr. Benchimol examined Plaintiff with similar results.

Her blood pressure has been controlled, and uric acid decreased.  Tr. 296.

Dr. Benchimol noted that "[s]he has had improvement in her fibromyalgia

symptoms since starting Cymbalta.  Continue current treatment.  *Id.*

On December 31, 2013, Dr. Benchimol examined Plaintiff and the

physical exam was generally normal.  Tr. 293-94.  Dr. Benchimol stated:

---

[14]  *See* Tr. 297-98 (Aug. 21, 2013, noting her autoimmune evaluation was positive for ANA Atypical speckled pattern 1:320 and nuclear pattern 1:160.  "This could certainly explain her systemic symptoms of chronic Myalgia and join[t] discomfort.  Her chest x-ray was negative.  After discussion we elected to refer her to rheumatology for further evaluation and review of treatment options.  I cannot exclude the possibility of underlying fibromyalgia as part of her clinical picture so I think she would benefit by starting the Cymbalta that was discussed at her last visit.  She was able to have it covered by her insurance and will begin taking the medication in the next few days.").

"Range of motion appears normal."  Tr. 294.  On the same day, Dr.
Benchimol completed an application (one-page check-off form) for a
permanent disabled person parking permit for Plaintiff, citing a "[s]evere
limitation to [Plaintiff's] ability to walk due to an arthritic, neurological, or
orthopedic condition."  Tr. 339.

On March 31, 2014, Plaintiff appeared with a complaint of
Lymphadenopathy.  Tr. 289.  It is noted that Plaintiff had "not been doing
well in terms of, myalgias, and joint discomfort.  These conditions were felt
to be secondary to a combination of autoimmune disorder and fibromyalgia.
She was tried on Plaquenil but could not tolerate the side effects of the
medication [and] was discontinued.  Currently she is only on NSAID
therapy as well as Cymbalta.  As a result, her discomfort has broken
through a few times and she has had lots of missed work."  Tr. 290.

Also on March 31, 2014, approximately two years before Plaintiff
alleges her disability began, Dr. Benchimol completed a Family Medical
Leave Act form (check-off form with some written notes) for Plaintiff's
employer noting that she would be incapacitated or need to work part-time
for her "lifetime as [lupus] flares up."  Tr. 318, 320.  He explained that the
episodic flare-ups would make it "difficult to type with joint pain," during
which time she would be absent from work or unable to perform her job

function.  *Id.*  He opined the frequency and duration of flare-ups would vary

and were unpredictable, and that the condition was lifelong.  *Id.*

Plaintiff contends that the ALJ reversibly erred in not discussing the

2014 form and explaining what weight it was given.  ECF No. 29 at 3.

Because the ALJ fully considered Dr. Benchimol's relevant treatment

records and other evidence, such as Plaintiff's statements, daily activities,

and work history, no reversible error occurred in the ALJ's failure to

specifically discuss and give weight to the 2014 opinion.  *See, e.g.*, Tillman

v. Comm'r, Soc. Sec. Admin., 559 F. App'x 975, 975 (11th Cir. 2014)

(finding ALJ's failure to explain specific weight given to medical opinion

harmless error where ALJ expressly noted and considered evidence in the

record indicating that claimant was not disabled).  Moreover, medical

opinions that predate the claimed onset of disability are of limited relevance

when the medical records applicable to the period under review do not bear

out the conclusions.  *See* Carmickle v. Comm'r, Soc. Sec. Admin., 533

F.3d 1155, 1165 (9th Cir. 2008) (stating that "[m]edical opinions that

predate the alleged onset of disability are of limited relevance") (cited in

Millionder v. Colvin, No. 3:13cv323/EMT, 2014 WL 4792602, at *11 (N.D.

Fla. Sept. 25, 2014)); *see also* Goff ex rel. Goff v. Comm'r of Soc. Sec.

Admin., 253 F. App'x 918, 922 (11th Cir.2007) (unpublished) (distinguishing

between medical opinions offered during the relevant time period from those that related back several years).

The medical records do not support the opinions in the Family Medical Leave Act form. For example, on April 21, 2014, a review of symptoms was generally normal, including that muscle weakness and Myalgia were not present. Tr. 287. Her physical exam results were normal, including notes that she was alert, cooperative, not in acute distress or sickly, oriented x4, and had normal posture and gait. Tr. 287-88. On June 11, 2014, Plaintiff followed up with Dr. Benchimol for hypertension. Tr. 285. A review of symptoms was generally normal as was the physical exam. Tr. 285-86.

On July 6, 2015, Plaintiff had a six-month follow-up exam with Dr. Benchimol and "[s]ince last visit she has been feeling well. A review of systems was normal as was the physical examination including the right and left upper extremities were normal strength and tone. Tr. 279-80. The mental status exam was also normal with several favorable findings. Tr. 280. She remained stable in terms of her lupus; was monitored by her rheumatologist. Regarding fibromyalgia, "[s]he has been doing well on Cymbalta for management of her fibromyalgia" and her current therapy continue. *Id.*

On August 28, 2015, Plaintiff complained of hip pain for approximately one month with pain increasing with weight-bearing, walking, and climbing stairs; she denied a fall. She was taking NSAID. Tr. 276. She was referred to "Institute Orthopedic." Tr. 277.

On January 6, 2016, her medical condition and issues were status quo. She continued to work with her pain specialist and her lupus was being managed by her rheumatologist (Mark Lloyd, M.D.) and appeared to be doing well. Tr. 272, 274. The review of systems and examination were generally normal. Tr. 273-74.

On November 10, 2017, and subsequent to the alleged onset date, Dr. Benchimol noted that Plaintiff "has been working with her rheumatologist concerning her diagnosis of fibromyalgia and lupus. She is on Cymbalta appears to be helping but she is still fairly limited in her activities. She is trying to main active." Tr. 484. Medications were refilled. Tr. 487-88.

Consistent with the patient notes, the ALJ noted:

In December 2017 adult health clinic notes, the record noted claimant reported a pain scale of "0" as she presented for medication refill, complaints of coughing, shortness of breath, chest congestion and stuffy nose. On review of systems, the claimant denied any complaints. Physical examination findings were noted as benign/unremarkable. The assessment included fibromyalgia, treated with refill of Cymbalta, asthma with status asthmaticus (disorder), treated with ProAir

medication refill and upper respiratory infection, treated with Amixicillin [sic] (Ex. 8F/29-34) [Tr. 520-26].

In January 2018 the claimant presented to the emergency department [at North Florida Regional Medical Center] for mild non-productive cough.  The claimant also complained of bilateral knee pain typical of fibromyalgia and lupus flare up.  The claimant reported a history of asthma.  On physical examination, the record noted supple neck, with full and painless range of motion.  No pulmonary rales or rhonchi on auscultation.  Claimant's back was noted as having full and painless range of motion, and no thoracic or lumbar tenderness. Neurologically, the claimant was noted as alert and oriented times three.  Her gross sensory and motor function were intact.  Chest radiology showed no acute cardiopulmonary abnormality. The record noted fibromyalgia and established hypertension, upper respiratory infection (Ex. 9F/3-8) [Tr. 580-85].  January [5,] 2018 adult health clinic progress notes reflect a focused visit.  The record noted a reported pain scale of "0".  The claimant presented for emergency department follow-up, and denied any symptoms.  On review of systems, claimant denied fatigue/tired or sluggishness.  The claimant also denied muscle/joint problems, muscle pain or swelling.  Similarly, the claimant denied neck pain, stiffness, dizziness, headache, movement problem, numbness or tingling.  Physical examination findings reflect claimant appeared in no acute distress, with no musculoskeletal joint abnormalities or swelling, full range of motion times four of all extremities and 5/5 muscle strength in all extremities. (Ex. 8F/23-[27) Tr. 514-18.]

Tr. 22-23.

## C.

From January 9, 2014, through June 2014, Plaintiff received

treatment from Mark Lloyd, M.D., at the SIMED Arthritis Center.  Tr. 304-

16, 333.  During this time, Plaintiff was found to have 18/18 trigger points

with moderate diffuse tenderness and was diagnosed with fibromyalgia and a diffuse connective tissue disorder.  Tr. 307 (June 12, 2014), 312 (May 29, 2014).  Her Mobic dosage was increased to twice daily for arthralgia flares.[15]  *Id.*

On January 27, 2016, Plaintiff returned to Dr. Lloyd for a follow-up after an 18 months absence, reporting she continued to take Mobic, Flexeril, and Cymbalta.  She had discontinued Plaquenil due to headache and dizziness; and she still had diffuse aches, pain, fatigue, and decreased sleep.  Tr. 353.  Upon examination, 18/18 trigger points were noted with moderate diffuse tenderness.  Tr. 356.  Dr. Lloyd's assessment was obesity, diffuse connective tissue disorder, arthralgia of the knee/patella/tibia/fibula, carpal tunnel syndrome, and myalgia and myositis.  Tr. 357-58.  He explained that the "physical exam is consistent with FMS

---

[15]  A review of systems indicated, in part, no neck pain or stiffness; no lump or swelling in the neck.  She had no back pain; no sudden unexplained fractures/broken bones in the past; no muscle aches and no localized soft tissue swelling (non-joint); no muscle spasms no localized joint pain.  Neurological and psychological systems were relatively normal with "no inability to cope with daily activities."  Tr. 334.  Physical findings provide, in part, that Plaintiff "was not overweight"; she was "[w]ell-appearing" and "in no acute distress."  Tr. 335.  She had 18-18 trigger points and trigger point pain.  Tr. 336.  Her neurological and psychiatric exams were normal.  *Id.*  The assessment included obesity, diffuse connective tissue disorder; arthralgia of the knee/patella/tibia/fibula; carpal tunnel syndrome; myalgia and myositis; and long-term use of other medications.  *Id.*  The plan included Mobic 7.5 mg tabs and she was placed on a rheumatology schedule to return in one month.  Tr. 337; *see* Tr. 325-30 (Mar. 24, 2014); Tr. 309-12 (May 29, 2014); Tr. 304-08 (June 12, 2014).

[fibromyalgia]" and left knee bursitis/osteoarthritis pain and, based on the laboratory testing positive ANA/SM/RNP an increased ESR (sedimentation rate), she "likely has MCTD [mixed connective tissue disease] as well." Tr. 358.

On March 8, 2016, Plaintiff reported ongoing symptoms of muscle and joint pain with fatigue. Tr. 379. The diagnosis remained same and medications were continued. Tr. 382-83. On April 21, May 19, June 16, August 10 (first page missing, Tr. 439-40), September 8, November 1, December 6, 2016, Plaintiff reported to Dr. Lloyd ongoing symptoms of muscle and joint pains with fatigue, but that she was doing better with the increased dosage of Cymbalta and Mobic. Tr. 364, 369, 374, 444, 449, 454. The diagnosis remained the same and medications were again continued. Tr. 367-68, 372-73, 377-78, 442-43, 446-47, 452-53, 457-58.

The treatment notes and examination remained the same on January 3 and February 2, 2017 (last page missing), with ongoing muscle and joint pain, fatigue, 18/18 positive trigger points with moderate diffuse tenderness, and unchanged diagnoses. Tr. 459, 462-64. Mobic, Hydrocodone-Acetaminophen, Cymbalta, and Flexeril were continued. Tr. 463.

The foregoing medical records do not support Dr. Colon's PRFCQ conclusions that Plaintiff is unable to work.  Nor do the records support Dr. Benchimol's 2014 opinion in the Family Leave (Family and Medical Leave Act) form that Plaintiff's lupus flareups would prevent her from typing and would cause her to be absent from work.  *See* Tr. 318, 320.  Rather, the records provide substantial evidence supporting the ALJ's assignment of an RFC finding Plaintiff could perform light, sedentary work as she had done in the past as clerk typist.[16]

### D.

Plaintiff also contends that the ALJ's rejection of her fibromyalgia-related symptoms and limitations is not supported by substantial evidence.  ECF No. 25 at 24.  The ALJ did find that Plaintiff's diagnosed fibromyalgia was a severe impairment, but concluded that her symptoms as reflected in

---

[16]  Plaintiff also contends that "to the extent Dr. Schiff's opinion is considered (even though it was not referenced by the ALJ), Dr. Schiff noted no medical source statements regarding limitations were reviewed at the time of his opinion, which renders the opinion based on incomplete evidence and internally flawed."  ECF No. 25 at 14.  She also cites as error the failure of the ALJ to indicate the weight accorded to Dr. Schiff's opinion.  *Id.* at 14-15.  Dr. Arthur Schiff, an agency reviewer, provided a residual functional capacity review on August 5, 2016, ECF No. 75-79, in which he concluded Plaintiff had some limitations in the performance of certain work activities, but the limitations would not prevent her from performing past relevant work.  Tr. 78.  Dr. Schiff was not a treating physician and, moreover, the ALJ is not required to discuss all the evidence.  <u>Mitchell v. Comm'r, Soc. Sec. Admin.</u>, 771 F.3d 780, 782 (11th Cir. 2014).  Further, Dr. Schiff's opinion did not impose any greater limitations on Plaintiff's functionality than did the ALJ.  As such, any failure to discuss Dr. Schiff's opinion is harmless.  *See, e.g.*, <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983).

the medical evidence did not show she could not do her past work as a clerk typist.  Tr. 17, 25.

The American College of Rheumatology has stated that fibromyalgia is both real and difficult to confirm.  *See generally* Frederick Wolfe, *et al.*, The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, 62 Arthritis Care & Research 600 (May 2010).  An extensive body of case law pre-dates the effective date of SSR 12-2p relating to courts' treatment of social security disability claims based on fibromyalgia.  See Johnson v. Colvin, No. 1:14cv149-WS/CAS, 2015 U.S. Dist. LEXIS 55388, at *31-38 (N.D. Fla. Mar. 25, 2015), *adopted*, 2015 U.S. Dist. LEXIS 55381 (N.D. Fla. Apr. 27, 2015), for a discussion of the legal standards in fibromyalgia cases pre-dating SSR 12-2p and a discussion of SSR 12-2p.  The following is a brief explanation of SSR 12-2p derived from Johnson.

The Social Security administration issued SSR 12-2p to assist factfinders in the evaluation of fibromyalgia.  SSR 12-2p, 2012 SSR LEXIS 1 at *1.  Social Security Ruling 12-2p "provides that once a claimant is determined to have fibromyalgia her statements about symptoms and functional limitations are to be evaluated according to the two-step process set forth in SSR 96-7p, 1996 SSR LEXIS 4."  Tully v. Colvin, 943 F. Supp.

2d 1157, 1165 (E.D. Wash. 2013); *see* SSR 12-2p, 2012 SSR LEXIS 1 at

*13. "These policies provide that '[i]f objective medical evidence does not

substantiate the person's statements about the intensity, persistence, and

functionally limiting effects of symptoms, we consider all other evidence in

the case record.'" *Id.* (quoting SSR 12-2P, 2012 SSR LEXIS 1); *see*

Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 (July 25, 2012).

Social Security Ruling 12-2p provides that the Social Security

Administration "will find that a person has an MDI [medically determinable

impairment] of FM [fibromyalgia] if the physician diagnosed FM and

provides the evidence we describe in section II.A. *or* section II.B., *and* the

physician's diagnosis is not inconsistent with the other evidence in the

person's case record."  SSR 12-2p, 2012 SSR LEXIS 1 at *4-5 (emphasis

added).  Sections II.A. and II.B. include *two sets of criteria for diagnosing*

*fibromyalgia*--the 1990 American College of Rheumatology ("ACR") Criteria

for the Classification of Fibromyalgia *or* the 2010 ACR Preliminary

Diagnostic Criteria.  *Id.*

The first set of criteria (1990) requires that the claimant demonstrate:

(1) a history of widespread pain; (2) at least 11 positive tender points[17] on

---

[17]  The criteria in section II.B. of SSR 12-2p may be used "to determine an MDI of
FM if the case record does not include a report of the results of tender-point testing, or
the report does not describe the number and location on the body of the positive tender

physical examination and the positive tender points must be found bilaterally, on the left and right sides of the body and both above and below the waist; *and* (3) evidence that other disorders, which could cause the symptoms or signs were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *5-7 (§ II.A.1.-3. criteria).

The second set of criteria (2010) requires that the claimant demonstrate: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions[18]; *and* (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions[19] were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *7-9.  *See* Lillard v. Comm'r,

---

points."  2012 SSR LEXIS 1 at *6 n.6 (§ II.A.2.b.).  In other words, tender-point testing under section II.A.2. may not be the exclusive manner to determine an MDI of FM.

[18]  Symptoms and signs that may be considered include the "(s)omatic symptoms" referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria.  We consider some of the "somatic symptoms" listed in Table No. 4 to be "signs" under 20 C.F.R. 404.1528(b) and 416.928(b).  These "somatic symptoms" include muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.  2012 SSR LEXIS 1 at *8 n.9.

[19]  *See* SSR 12-2p, 2012 SSR LEXIS 1 at *9 n.10 for a list of these conditions.

Soc. Sec., Civil Case No. JKB-13-1458, 2014 U.S. Dist. LEXIS 66720, at *6

n.1 (D. Md. May 14, 2014).

Social Security Ruling 12-2p provides guidance regarding the

documentation needed, other sources of evidence, and what can be done if

the evidence is insufficient. Guidance is also provided regarding how FM is

considered in the five-step sequential evaluation process. SSR 12-2p,

2012 SSR LEXIS 1 at *9-19.

When determining whether Plaintiff has "severe impairments," the

ALJ considered that Plaintiff was assessed with fibromyalgia, and found it

to be one of her severe impairments. Tr. 21. The medical record showed

that Plaintiff had 18/18 trigger points indicative of fibromyalgia, with

moderate diffuse tenderness and a diffuse connective tissue disorder.

Tr. 307 (June 12, 2014), 312 (May 29, 2014). However, the ALJ noted that

medical notes from a January 2016 rheumatology visit show Plaintiff

reporting no back pain or muscle aches, no memory lapses, normal gait

and stance, normal motor strength, and normal deep tendon reflexes.

Tr. 21. Throughout 2016 to March 2017, Plaintiff noted no new complaints

and similar examination findings. *Id.* The ALJ noted that in September

2016, Plaintiff reported a pain scale of "0." Tr. 22. Plaintiff reported pain

"all over" in March 2017, but in June 2017 Plaintiff reported symptoms

improved with increase in medication. *Id.* The ALJ noted that in November 2017, Plaintiff denied fatigue and musculoskeletal complaints. Her physical exam findings were generally normal. *Id.* In December 2017, Plaintiff reported a pain scale of "0." *Id.* The ALJ noted that in January 2018, health clinic progress notes indicate Plaintiff reported no pain and denied muscle or joint problems. Tr. 23. Similarly, in April 2018, Plaintiff reported a pain scale of "0" and denied fatigue. *Id.*

The ALJ noted Plaintiff reported in 2016 that she was able to drive, shop for groceries, and prepare some meals, but testified at the hearing in 2018 that her daughter helps her with those tasks, and that Plaintiff can still perform some activities of daily living such as bathing and dressing.[20]

The medical records do not demonstrate that Plaintiff has suffered functionally limiting effects of the fibromyalgia symptoms such that she would be unable to perform past work as a clerk typist. A diagnosis of fibromyalgia alone does not establish disabling limitations. *See, e.g.*, Laurey v. Comm'r of Soc. Sec., 632 F. App'x 978, 988 (11th Cir. 2015) (unpublished); Klaes v. Comm'r of Soc. Sec., 719 F. App'x 893, 897 (11th Cir. 2017) (unpublished). "[T]he mere existence of the[ ] impairments does

---

[20] A claimant's daily activities may be considered in evaluating and discrediting complaints of disabling pain. Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984).

not reveal the extent to which they limit [the claimant's] ability to work or undermine the ALJ's determination in that regard."[21] <u>Moore</u>, 405 F.3d at 1213 n.6.  "Disability is determined by the effect an impairment has on the claimant's ability to work, rather than the diagnosis of an impairment itself." <u>Davis v. Barnhart</u>, 153 F. App'x 569, 572 (11th Cir. 2005); <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986) (" 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work").  The ALJ also noted that the medical record documents conservative treatment that was reported to be fairly effective for her impairments, which indicates her symptoms were not as limiting as she alleged.  *See, e.g.,* <u>Falcon v. Heckler</u>, 732 F.2d 827, 832 (11th Cir. 1984). Her records indicate she was doing well on her Cymbalta medication therapy.  Tr. 280.  *See also* Tr. 374, 433, 444.

---

[21] As the Eleventh Circuit has explained, an ALJ did not err in giving little weight to the doctor's opinion that fibromyalgia was disabling for two reasons: "(1) because it concerns a matter reserved to the Commissioner, 20 C.F.R. § 404.1527(d); and (2) because taking longer to perform activities of daily living and having some pain with activity and stress is not inherently disabling."  <u>Nance v. Soc. Sec. Admin., Comm'r</u>, 781 F. App'x 912, 919 (11th Cir. 2019) (unpublished).  The Court noted the doctor's treatment notes concerning the claimant's range of motion, strength, and gait as supporting the ALJ's decision.  *Id.*  Further, in evaluating a claimant's residual functional capacity, the ALJ appropriately considers the effectiveness and side effects of any medication.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).  <u>Sorter v. Soc. Sec. Admin., Comm'r</u>, 773 F. App'x 1070, 1073 (11th Cir. 2019) (unpublished).

The ALJ's decision to find Plaintiff not disabled despite a finding that her fibromyalgia is a severe impairment is supported by substantial evidence and correct application of the law. *See generally* Land v. Astrue, No. 5:09cv369/SPM/MD, 2011 WL 834005, at *1 (N.D. Fla. Jan. 6, 2011), *report and recommendation adopted*, 2011 WL 825683 (N.D. Fla. Mar. 4, 2011) (affirming Commissioner's denial of disability benefits despite diagnosis of fibromyalgia). This Court will not make factual findings or credibility determinations in the first instance or reweigh the evidence. Tisdale v. Soc. Sec. Admin., Comm'r, No. 19-1230, 2020 WL 1243642, at *1 (11th Cir. Mar. 16, 2020) (unpublished) (citing Moore, 405 F.3d at 1211); Raices v. Comm'r of Soc. Sec., No. 19-12718, 2020 WL 1062132, at *2 (11th Cir. Mar. 5, 2020) (unpublished) (citing Phillips, 357 F.3d at 1240 n.8 ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." ((alteration in original) (quoting Bloodsworth, 703 F.2d at 1239)); Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir.1996) ("If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."); Edwards, 937 F.2d at 584 n.3 (noting that this Court will not reverse a decision supported by substantial evidence even if, had we been the finder of fact, we would have reached a contrary result and even if the

evidence preponderates against the Commissioner's decision).  As the ALJ

determined, even considering Plaintiff's diagnosis of fibromyalgia,

substantial evidence supports the conclusion that she is capable of

performing past relevant work as a clerk typist because such work does not

require activities precluded by her RFC.  Tr. 32.

## E.

Finally, Plaintiff contends that the ALJ  failed to consider and

reconcile his finding that Plaintiff had mild mental limitations with his

determination that Plaintiff could perform work as a clerk typist.  ECF No.

25 at 21.  The ALJ considered the medical record, including evidence of

any mental impairment, and concluded that Plaintiff's anxiety disorder does

not cause more than a minimal limitation in the claimant's ability to perform

basic mental work activities and was non-severe.  Tr. 18.  The ALJ also

noted that Plaintiff reported being able to drive, shop, count change, pay

bills, handle a savings account, and use a checkbook.  *Id.*  Plaintiff reported

no side effects from her medication and the record documents no difficulty

with the ability to understand, learn terms, instructions, and procedures,

follow a one or two step oral instruction, and carry out a task.  *Id.*

The ALJ discussed the opinions of Dr. Nancy Dinwoodie and Alan

Harris, Ph.D., state agency consultants who reviewed the record in May

2016 and July 2016.  Tr. 23.  Dr. Dinwoodie noted in her review in May 2016 that Plaintiff did not claim any mental limits that affect her ability to work.  Tr. 60.  Dr. Harris noted in July 2016, that there was no evidence or allegation of mental limits affecting the ability to work.  Tr. 74.  Despite these opinions in 2016, and the fact that Plaintiff did not initially claim any functional limitations due to anxiety, the ALJ noted the medical records from 2017 and 2018 concerning Plaintiff's mental condition and status.  Tr. 18-19.  The ALJ also heard Plaintiff's testimony about memory problems and her earlier medication for anxiety, which affects her several times a year.  Tr. 42-43, 45, 46.  The ALJ's conclusions concerning Plaintiff's non-severe mental impairment have not been shown to be deficient due to any perceived contradiction to the opinions of Drs. Dinwoodie and Harris.

Further, the ALJ noted that each reviewing doctor determined that Plaintiff's anxiety disorder produced no restrictions on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace Tr. 23-24.  Plaintiff has not identified any evidence in the record concerning her anxiety disorder that imposes limitations on her ability to do sedentary, light work as a clerk typist.

## V. Conclusion

Plaintiff has the burden to prove she is disabled.  <u>Moore</u>, 405 F.3d at 1211.  The record does not support Plaintiff's assertion that she was disabled through her date last insured, that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).  Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for Defendant and close the file.

**DONE AND ORDERED** at Tallahassee, Florida, on April 6,  2020.


<u>s/  Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**